UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------- x
HECTOR TORRES,                                                 :
                                                              :
                              Plaintiff,                       :
                                                              :
              v.                                               :        22-CV-1008 (SFR)
                                                              :
JENNIFER REIS et al,                                          :
                                                              :
                              Defendants.                      :
------------------------------------------------------------- x
```

### MEMORANDUM & ORDER

Plaintiff Hector Torres is serving a sentence of incarceration in the custody of the Connecticut Department of Correction ("DOC"). Pursuant to 42 U.S.C. § 1983, Torres sued Deborah Broadley, Debra Cruz, Vincent Santavenere, Kirsten Shea, and Colleen Gallagher ("Defendants") in their individual capacities, asserting that they were deliberately indifferent to his medical treatment needs in violation of the Eighth Amendment to the U.S. Constitution. Torres also sued Cruz, Broadley, and Administrative Remedies Coordinators Cooper and Shelton on the grounds that they retaliated against him for filing grievances in violation of the First Amendment of the U.S. Constitution. Finally, Torres moved for an injunction to remedy an ongoing Eighth Amendment violation. After the close of discovery, Defendants moved for summary judgment on all claims. For the reasons set forth below, I grant Defendants' motion for summary judgment as to Torres' First and Eighth Amendment claims against Defendants in their individual capacities for damages related to conduct between April 2017 and February 2023, but deny without prejudice the motion for summary judgment as to Torres' claim for injunctive relief. The parties shall submit a joint notice on or before September 12, 2025,

proposing deadlines for a renewed motion for summary judgment on the claim for injunctive relief.

## I.    **BACKGROUND**

### A.    **Factual Background**

The following factual background is taken from the complaint,[1] the Defendants' Local Rule 56 statement ("L.R."),[2] declarations and deposition transcripts submitted by the parties, and the underlying evidentiary record.[3]

---

[1] My review of the record includes the allegations of the complaint. *See Jordan v. LaFrance*, No. 3:18-cv-1541 (MPS), 2019 WL 5064692, at *1 n.1 (D. Conn. Oct. 9, 2019) (noting that a verified complaint may be considered as an affidavit for summary judgment purposes); *Walcott v. Connaughton*, No. 3:17-cv-1150 (JCH), 2018 WL 6624195, at *1 n.1 (D. Conn. Dec. 18, 2018) (same).

[2] Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides, in relevant part: "Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." It states that the "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1." *Id.*

[3] Torres' appointed counsel never filed a Local Rule 56(a)2 Statement of Facts. *See* Pl.'s Obj. & Mem. of Law in Opp. to Defs.' Mot. for Summ. J., ECF No. 58. Defendants say that this waives Torres' ability to dispute any facts contained within Defendants' Local Rule 56(a)1 Statement, and assert I should deem admitted all facts in Defendants' Statement. Defs.' Reply to Pl.'s Opp. to Mot. for Summ. J., ECF No. 59, at 1-2. However, under the Local Rules and binding case law, I will deem as admitted only those facts included in Defendants' Statement of Facts that are supported by the evidentiary record. *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014).

### 1.    Treatment at Cheshire Correctional Institution

Torres began complaining of stomach pain in 2017. Compl. 10, 35-37, ECF No. 1.[4] RN Jane Ventrella, a DOC health provider, responded that Torres was scheduled to address these concerns with a doctor. *Id.* at 37. Six months later, on January 30, 2018, Torres wrote again complaining that he still had not been seen by a doctor to address his constant stomach pain. *Id.* at 39. It appears Torres was seen by medical staff on February 12, 2018.[5] *Id.* Six months later, on August 13, 2018, Torres wrote again that he continued to struggle with constipation and that the medicine and pills he had been proscribed had "probably made my problem worst [sic]." *Id.* at 41. Torres was instructed to return to sick call. *Id.* Several months later, on a form dated November 30, 2018, Torres complained that his condition had continued to worsen since he last saw a provider. *Id.* at 43. Torres wrote that his constipation had not been alleviated by the various treatments he had been prescribed. *Id.* DOC responded by scheduling a follow-up visit. *Id.* In records from a visit with a DOC physician on April 30, 2019, Torres reported a moderate improvement in his condition. Medical Records, ECF No. 49, at 663.

Defendant Deborah Broadley, an Advanced Practice Registered Nurse (APRN), began providing care for Torres at Cheshire in February 2020. Broadley Decl., ECF No. 53-6, ¶¶ 5, 15. Broadley was a primary care provider involved with Torres' care from 2020 to present, except from October 2021 to March 2022 and from September 2022 to June 2023 when she was either out on medical leave or assigned to DOC's Central Office for medical reasons. *Id.*

---

[4] The page numbers cited to in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

[5] A note on Torres' January 30, 2018 inmate request form states "seen 2/12." Compl. 39.

¶¶ 46-51, 59. Defendant Debra Cruz was Head Nurse at Cheshire for all relevant periods during this lawsuit. Cruz Decl., ECF No. 53-5, ¶ 6. As a nurse, Cruz was responsible for gathering information about patients' symptoms and implementing orders issued by APRNs, doctors, and physician's assistants. *Id.* ¶¶ 12-13. Cruz also had authority to request that an APRN, doctor, or physician's assistant conduct a further assessment of a patient. *Id.* ¶ 13.

Torres was evaluated by Broadley on February 24, 2020. ECF No. 49, at 661. Broadley's notes from that visit record that Torres spoke to her about his "long history of constipation and abdominal pain." *Id.* Broadley discontinued the use of the fiber supplement (Metamucil) that Torres said had been ineffective, scheduled him for an ultrasound, and ordered an alternative laxative. *Id.*

On July 22, 2020, Torres submitted a request to the Warden of Cheshire Correctional Institution. Compl. 45. Torres complained that he had received inadequate treatment from DOC providers and asserted that he had been removed without explanation from the list of people referred to see a specialist at UConn. *Id.* Defendant Kirsten Shea responded to Torres on August 5, 2020; she said there was "no documentation of any recent complaints of your stomach or constipation." *Id.* at 47. Shea told Torres she had entered a referral for him to be evaluated by the onsite provider. *Id.* In response to the referral from Shea, Broadley wrote on August 6, 2020: "I have reviewed [Torres'] chart. Patient was seen in February 2020. Meds were changed and lab (TSH) ordered. TSH was normal. Patient has not written since then to report any continued issue. I have asked nursing to call patient for Prompt Care to assess his status." ECF No. 49, at 655.

Torres was evaluated by Cruz and Broadley on November 2, 2020. ECF No. 49, at 648-54. Torres reported that he was in severe pain and that he remained highly constipated. *Id.* at

652. An x-ray conducted during that same visit was normal except for a "moderate amount of stool in [Torres'] colon." *Id.* at 651. Broadley's notes from that same visit record that she discussed a treatment plan with Torres and scheduled a follow-up visit to review the treatment plan moving forward. *Id.* at 648-50. Torres returned for the follow-up visit with Broadley on November 9, 2020. *Id.* at 640. Broadley reviewed the results of the x-ray with Torres. *Id.* She also discussed Torres' request for a high fiber diet; although she told Torres that DOC policy prevented her from ordering a high fiber diet, she gave Torres the kitchen supervisor's contact information. *Id.*[6] Broadley further instructed Torres to return to the prison medical unit the following week so that he could report progress and amend the treatment plan; she noted that she would consider prescribing an additional laxative if his symptoms did not improve. *Id.* Torres' medical records indicate that Broadley prescribed a laxative on November 16, 2020. *Id.* at 635.

Torres wrote to Broadley on January 28, 2021, asking that he be reevaluated because his condition had not improved. Compl. 53. Torres was seen by APRN Charles on February 8, 2021. ECF No. 49, at 624. Charles (who is not named as a defendant in this action) noted that Torres' constipation had improved until his prescription for laxatives ran out; Charles refilled that prescription and urged Torres to focus on behavioral and dietary changes to relieve his

---

[6] Broadley says in her declaration that she ordered fiber supplements for Torres that met and exceeded the level of fiber in a "formal high-fiber diet," and Torres had commissary options to increase his fiber intake further. ECF No. 53-6, ¶ 29. Broadley does not state when she prescribed the fiber supplements. The medical records provided by Defendants show that Torres was taking Metamucil at the time he first saw Broadley in February 2020, but that this supplement was discontinued because Torres reported it was ineffective. ECF No. 49, at 661. The records provided do not show when and if Broadley prescribed fiber supplements after this date. The records do show that Dr. Williams prescribed Torres a fiber supplement (CVS Daily Fiber .52 GM Oral Capsule) on April 19, 2023, *id.* at 15, and that Torres took this supplement thereafter, *id.* at 3-13.

constipation. *Id.* Although Torres asked to be evaluated by a specialist at UConn, Charles noted that neither an external referral nor additional imaging were appropriate at that time. *Id.*

Torres was seen again on March 22, 2021. ECF No. 49, at 609-11. He reported that he was in moderate/severe pain and was prescribed an additional laxative. *Id.* at 609-10. Broadley evaluated Torres on March 23, 2021. *Id.* at 606. At that time, Broadley agreed to refer Torres to an external gastrointestinal specialist; she also prescribed Trulance, a different laxative than Torres had been prescribed previously. *Id.* at 607. At a follow-up visit on April 6, 2021, Broadley noted that Torres reported improvement in his constipation after starting Trulance. *Id.* at 602. Broadley recorded that she reviewed the remaining details of Torres' treatment plan with Torres:

> a. CT scan with/without oral contrast will evaluate structure.
> b. GI consult to discuss further management as at this point, I have trialed everything I have available to me. Given we are making progress, will defer to GI.
> c. PPTs are in place for above. Patient informed DOC has no control over the timing of the appointment.

*Id.* at 602.

A CT scan was completed on April 30, 2021; it revealed "[m]oderate stool without any other significant abnormalities in your colon." *Id.* at 599. It also detected a "small gallstone" and "a 'blood blister' (in layman's terms) on [Torres'] liver." *Id.* In describing these results to Torres, Broadley wrote that "[n]either require any further intervention." *Id.*

On May 29, 2021, Torres asked to discuss the results of his CT scan. Compl. 71. Torres met with Vincent Santavenere on June 3, 2021 to discuss these concerns. ECF No. 49, at 581.

Santavenere was a Nursing Supervisor at Cheshire from 2020 until 2024.[7] Santavenere elaborated on the findings of the CT scan and reiterated that Torres had been referred to an outside specialist at UConn. *Id.* Torres also discussed his CT scan with Charles on July 23, 2021. *Id.* at 520.

On February 15, 2022, Torres submitted a request to the medical unit complaining about changes in the delivery of his medications and noting that he still had not seen a specialist at UConn. ECF No. 1-1, at 51. That same day, he wrote to Cruz for confirmation that he was still on the list of patients referred to see a specialist at UConn; Cruz confirmed on March 1, 2022 that he was on the list. ECF No. 1-1, at 53.

On February 17, 2022, Torres reported chest discomfort and abdominal pain. ECF No. 1-1, at 62. After being evaluated in Cheshire's medical unit, the on-call physician at Cheshire determined that Torres required treatment beyond Cheshire's capabilities and ordered Torres transferred to the emergency department at UConn Health's John Dempsey Hospital. *Id.* at 62; ECF No. 49, at 309-10. At the emergency department, Torres received an abdominal ultrasound. L.R. ¶ 83, ECF No. 53-2; ECF No. 49, at 293-96. The attending physician at UConn wrote:

> Diagnostics show cholelithiasis without evidence of obstruction or cholecystitis on ultrasound. CBC shows normal counts, chemistries show no evidence for an obstructive process/elevation of liver enzymes. Patient will need an evaluation by surgery for elective surgical removal of gallbladder. He will need to come back to the emergency department if he has any intractable pain, spikes a fever of 101 or higher.

---

[7] Torres' complaint refers to Santavenere as "M. Vince." Compl. 3. Defendants note that this defendant's full name is Vincent Santavenere. Defs.' Mem. 1 n.1. In light of this, I refer throughout to Vincent Santavenere as "Santavenere."

ECF No. 49, at 295.[8] Torres returned to Cheshire that same night. ECF No. 1-1, at 60.

In reviewing the report from Torres' visit to UConn Health, Cruz wrote: "vital signs stable, gallbladder, may need surgery nothing emergent." ECF No. 49, at 306. Broadley, who was not working at Cheshire at the time, entered these instructions into Cheshire's medical records on February 18, 2022. ECF No. 49, at 291. She also confirmed that Torres was scheduled to see the GI specialist as she previously requested. *Id.*

Torres met with Santavenere on February 23, 2022, to discuss the findings of the recent CT scan. ECF No. 49, at 279. Santavenere recorded Torres' frustration over the delay in seeing outside specialists; Santavenere also confirmed to Torres that a referral had been placed for Torres to consult with a surgeon regarding whether to conduct an elective cholecystectomy.[9] *Id.*

Torres returned to the medical unit on February 28, 2022. *Id.* at 271. Torres complained of ongoing abdominal pain and asserted that the medication he had been prescribed was worsening his symptoms. *Id.* RN Alexis Losgar's report notes that Torres emphasized during the visit that he was not refusing treatment. *Id.* Losgar's notes reflect that she assessed Torres' symptoms, reminded him that he had an upcoming appointment with a specialist, and invited him to return to the medical unit if his symptoms worsened. *Id.*

Torres returned to the medical unit to report severe abdominal pain on March 7, 2022. *Id.* at 257. Torres was examined by Charles. *Id.* at 256. Charles notes that Torres felt that the

---

[8] Cholecystitis is a condition where hardened pieces of bile form in a patient's gallbladder or bile ducts. L.R. ¶ 72.

[9] A cholecystectomy involves the surgical removal of the gallbladder. ECF No. 53-6, ¶ 50; Mayo Clinic, *Cholecystectomy (gallbladder removal)*, https://www.mayoclinic.org/tests-procedures/cholecystectomy/about/pac-20384818 (last updated Apr. 15, 2025).

medication he had been prescribed (Trulance) was no longer effective in treating his constipation. *Id.* at 254. Charles prescribed an alternative medication (Linzess) to explore if it would be more effective than Trulance; she also ordered a test for H. pylori to explore whether Torres has "GERD" (presumably gastroesophageal reflux disease). *Id.* at 256. On March 22, 2022, Cruz saw Torres, who complained that he experienced abdominal pain after starting Linzess. *Id.* at 236. Torres' test for H. pylori came back negative on March 26, 2022. *Id.* at 225.

### 2.    Visits with Outside Specialists at UConn Health and Follow-Up Care at Cheshire

Torres had a virtual visit with a gastroenterologist at UConn Health on March 30, 2022. ECF No. 49, at 215. The visit was held virtually because of the COVID-19 pandemic. *Id.* The gastroenterologist's notes reflect a review of the CT-scan from February 2022 and a detailed discussion with Torres about his symptoms. *Id.* at 215-16. The doctor assessed Torres as having "[l]ong standing constipation which has not been responding to multiple medical therapies" and recommended magnesium citrate cleanout with Dulcolax followed by a higher dose of Linzess. *Id.* at 219. The doctor said Torres should have a colonoscopy and an upper endoscopy should be considered to evaluate for reflux, PUD, gastritis, and H. pylori. *Id.* The following day, Broadley ordered the medications that the gastroenterologist had prescribed and began preparations for Torres to have a colonoscopy. *Id.* at 211.

Torres had a surgery consultation at UConn Health on April 12, 2022. *Id.* at 187. The purpose of the consultation was to evaluate whether it would be appropriate to remove Torres' gallstone (cholelithiasis). *Id.* at 187. The surgeon recommended that surgery was not

appropriate, and recommended a follow up visit with the gastroenterologist for an EGD (upper endoscopy) and colonoscopy. *Id.* at 187.

Torres returned to the medical unit on August 29, 2022, to address what he described as moderate abdominal pain. *Id.* at 43. Torres reported that his abdominal pain increased after taking the laxative he had been prescribed and requested an update on when he would have a colonoscopy and upper endoscopy. *Id.* RN Allyson Ramos referred Torres to the medical unit; Broadley met with Torres the following day. *Id.* at 40-43. Broadley's notes acknowledge that the gastroenterologist had recommended an EGD and colonoscopy; Broadley's notes also record that she sent an email "to Central Office re: patient concern his procedures have not been done yet." *Id.* at 40. Broadley discussed Torres' concerns and adjusted the manner in which his medications were delivered: at Torres' request, Broadley agreed to allow Torres to self-administer the prescribed laxative rather than returning to the medical unit to take the medication under supervision. *Id.* at 40.

Torres had a colonoscopy and an upper endoscopy in February 2023. ECF No. 53-6, ¶ 61; ECF No. 49, at 16. In her declaration, Broadley reports that neither examination revealed significant abnormalities. ECF No. 53-6, ¶ 64. Torres' medical records show that he met with another provider at Cheshire CI, Dr. Williams, to review the findings from the procedures on April 19, 2023. ECF No. 49, at 16. Williams said:

> The EGD showed evidence of hiatal hernia, and a solitary gastric polyp was identified and excised. The examined areas of the esophagus and duodenum were reported as normal. Pathology of the gastric polyp indicated hyperplastic status; this biopsy as well as another at the antrum showed evidence of erosive reactive gastropathy, but were both negative for H. pylori. The colonoscopy did not reveal any polyps.

*Id.* Williams continued the Linzess, ordered "docusate as a stool softener," and "also a PPI Rx (e.g. pantoprazole) for the gastropathy." *Id.* Williams assessed Torres with "chronic constipation" and "erosive reactive gastropathy and hiatal hernia." *Id.* at 17. The next day, Torres was given Pantoprazole. *Id.* at 16.

At his deposition on July 24, 2024, Torres asserted that his symptoms have not abated, saying "I be having stomach problems all the time, and it's—it's constantly." ECF No. 58-1, at 5.

### 3.  Grievances and Other Complaints Relating to Torres' Medical Care

Torres submitted a grievance on January 29, 2021, requesting a Health Service Administrative Review of a healthcare issue not concerning a diagnosis or treatment. Compl. 55; ECF No. 53-5, at 35-36. Torres complained that he remained in constant pain and the treatments he had been prescribed had not worked. *Id.* Torres asserted that "no one is responding to my request [for treatment]." *Id.* On March 11, 2021, Torres submitted a request to the Grievance Coordinator at Cheshire, noting that he had not received a timely response to his medical grievance. Compl. 59. The grievance coordinator responded that Torres would need to write to the Medical Grievance Coordinator to address this concern. *Id.* Torres' grievance was upheld on April 16, 2021. ECF No. 53-5, at 36. Nurse Cruz wrote that "all avenues have been tried," such that a referral to an external specialist was appropriate. *Id.*

Torres submitted a Level 2 grievance in early 2021. Compl. 65. The grievance itself does not appear within the exhibits submitted by the parties. Instead, the record includes solely the response from Defendant Administrative Records Coordinator (ARC) Shelton. *Id.* Shelton

notified Torres on March 22, 2021, that she had rejected the grievance "because it must be accompanied with your level 1 grievance with disposition." *Id.*

On June 1, 2021, Torres submitted a request to Santavenere to understand why his prescription laxative had been modified. Compl. 14, ¶ 47; ECF No. 1-1, at 14. Torres asked why he was required to take his prescription under supervision rather than in his cell. ECF No. 1-1, at 14. Torres reports that he told Santavenere that he felt that his medical providers required him to take medication under supervision as a form of retaliation for the grievances he had filed. Compl. 14, ¶ 47.

On June 7, 2021, Shelton notified Torres that if he wanted to submit a grievance regarding medical needs or medical staff he should submit a grievance pursuant to Administrative Directive 8.9. ECF No. 1-1, at 18. Torres' complaint asserts that this was a form of retaliation. Compl. 14, ¶ 49.

On June 16, 2021, Cruz rejected a medical grievance submitted by Torres. ECF No. 1-1, at 24. Cruz noted that DOC had recently revised its policy regarding medical grievances and updated the forms used to submit medical grievances. *Id.* Cruz enclosed the correct form and provided instructions on where Torres could submit his grievance. *Id.* In his complaint, Torres asserts that Cruz rejected Torres' grievance "as a form of retaliation" and in an effort to "discourage the plaintiff from further making any future complaints." Compl. 14, ¶ 52.

Torres submitted a Level 1 Health Services Administrative Remedy concerning a diagnosis or treatment on June 22, 2021. ECF No. 53-5, at 42-43.[10] He complained that (1) he required a special diet that would increase fiber and address his gallstones constipation and (2)

---

[10] A copy of this grievance is also attached to the Complaint. ECF No. 1-1, at 30.

Cheshire's medical unit had failed to respond to his requests for dietary changes. *Id.* at 42. His grievance was upheld in part on July 12, 2021 by Broadley, who noted that Torres' concerns would be addressed by a GI specialist at UConn. *Id.* at 43. Torres filed a Level 2 HSAR on July 17, 2021. *Id.* at 46; ECF No. 53-10, at 24.[11] This Level 2 HSAR challenged Broadley's assertion that he would have to wait for any further changes to his care plan until he waited to see a GI specialist at UConn. ECF No. 53-10, at 24. In particular, Torres sought a follow-up appointment with his prescriber (presumably Broadley) to address his gallstones and identify a special diet to treat his condition. *Id.* Torres' appeal was rejected on August 30, 2021 by Shea, who noted that Torres cannot appeal a prescription and diagnosis. *Id.* The rejection noted that Torres had exhausted the DOC's Administrative Health Services Remedies. *Id.*

On July 9, 2021, Cooper rejected a grievance submitted by Torres. Compl. 15, ¶ 60; ECF No. 1-1, at 42. Cooper's letter asserted that Torres had filed an appeal using the incorrect form. ECF No. 1-1, at 42. Cooper enclosed the correct form in her response. *Id.* Torres says that he believes that Cooper took this action as a form of retaliation. Compl. 15, ¶ 60.

Torres filed another Level 1 HSAR on July 14, 2021. ECF No. 1-1, at 44; ECF No. 53-5, at 49. He complained that he had not received any treatment for the gallstone detected in the CT scan; he further requested a follow-up appointment with a doctor. *Id.* The grievance was upheld. ECF No. 53-5, at 50. The reviewer, Charles, noted that Charles met with Torres on July 23, 2021 to explain the findings of his CT scan and the plan that Torres would follow up with a GI specialist at UConn for further questions. *Id.*

---

[11] Torres dated his Level 2 HSAR as July 17, 2021, but the grievance is recorded as received on August 2, 2021. *See* ECF No. 1-1, at 46. Neither party suggests there is any significance to this discrepancy over filing dates.

Torres submitted another Level 1 HSAR on February 28, 2022. ECF No. 53-5, at 53. Torres challenged a diagnosis or treatment, asserting that the medical unit was refusing to respond to his requests for treatment while waiting to see a specialist. *Id.* Torres' grievance was upheld on March 4, 2022; Nurse Vitale noted that Torre' prescription for laxatives had been updated. *Id.* at 54. After Torres tried to appeal the medical unit's decision to change his laxative medication rather than prescribe a different medication for gallstones, *see* ECF No. 53-5, at 58, his appeal was rejected because his "diagnosis and treatment grievance [were] not up for appeal." *Id.* at 57.

Torres submitted another Level 1 HSAR related to diagnosis and treatment on March 7, 2022. ECF No. 53-5, at 60-61. Torres complained that "Nurse Sandrea," a treatment provider at Cheshire CI, had told Torres his condition was not serious and nothing was wrong with him. *Id.* Torres' grievance was denied on March 31, 2022, by Vincent Santavenere, who noted that RN Sandra Charles was no longer employed by Cheshire. *Id.* at 61. Santavenere further noted that Torres was seen by a specialist on March 30, 2022. *Id.*

### B. Procedural History

Torres, proceeding *pro se*, filed a Complaint on August 8, 2022, alleging that "medical care has been and is being refused and delayed to plaintiff." Compl. 8.

On the same day, he moved for leave to proceed *in forma pauperis*. ECF No. 2. After the Court[12] denied Torres' motion to proceed *in forma pauperis*, ECF No. 8, Torres timely paid a filing fee on December 7, 2022.

---

[12] The Honorable Victor Bolden, United States District Judge, presided over this action until January 6, 2025, when it was transferred to me. ECF No. 44.

The Court entered an Initial Review Order pursuant to 28 U.S.C. § 1915A(a) on April 7, 2023. Initial R. Order ("IRO"), ECF No. 13. The Court permitted Plaintiff to proceed on claims of deliberate indifference in violation of the Eighth Amendment against five named defendants in their individual capacities for damages. In addition, because the Torres' Complaint "alleges that he is subject to ongoing Eighth Amendment medical indifference," the Court permitted Torres to proceed against the five named defendants in their official capacities for injunctive or declaratory relief. Finally, the Court permitted Torres to proceed on his First Amendment retaliation claims against four named defendants in their individual capacities. IRO 11-12. Defendants filed an Answer to the Complaint on July 24, 2025. Defs.' Answer & Aff. Defs. ("Answer"), ECF No. 26. The Court granted Torres' motion for appointment of counsel on July 25, 2023. ECF No. 28.

Prior to the appearance of his appointed counsel, Plaintiff filed a *pro se* motion for an "Emergency Injunction" on August 22, 2023. Pl.'s Mot. for an Emerg. Inj., ECF No. 32. The Court invited appointed counsel to supplement Torres' motion by September 1, 2023. ECF No. 33.[13] After appointed counsel did not do so, the Court denied the motion without prejudice to renewal "to the extent a more sufficient basis is provided for the relief sought." ECF No. 35.

Defendants moved for summary judgment on February 14, 2025. Mem. of Law in Supp. of Defs.' Mot. for Summary J. ("Defs.' Mem."), ECF No. 53-1. Torres timely filed a response

---

[13] Soon after appointment, Plaintiff's counsel moved for a modest extension of time to supplement Torres' motion for an emergency injunction. ECF No. 34. The Court did not rule on this motion for extension of time until January 9, 2024, when it denied Torres' motion for a preliminary injunction. ECF No. 36.

on April 21, 2025. Pl.'s Obj. & Mem. of Law in Opp. to Defs.' Mot. for Summary J. ("Pl.'s Mem."), ECF No. 58. Defendants filed a Reply on April 25, 2025. Defs.' Reply to Pl.'s Opp. to their Mot. for Summary J. ("Reply"), ECF No. 59. I heard oral argument on the motion on July 16, 2025. ECF No. 60.

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment must be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

When deciding a motion for summary judgment, I may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *7. In reviewing the record, I must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.    **DISCUSSION**

Defendants argue that no reasonable jury could conclude from this record that any Defendant was deliberately indifferent to Torres' medical needs. Defs.' Mem. 18-28. Furthermore, they assert that Torres' retaliation claims do not present a triable issue: Defendants say the record shows that Torres failed to exhaust administrative remedies

regarding the retaliation claims and, on the merits, that it is evident as a matter of law that Defendants did not violate the First Amendment. *Id.* at 9-14, 31-38. Finally, Defendants submit that Torres' claim for injunctive relief is barred by the Eleventh Amendment and the Prison Litigation Reform Act. *Id.* at 39-41.

### A.    Eighth Amendment Deliberate Indifference – Damages Claim

My consideration of Torres' deliberate indifference claim for damages covers the period of time covered by the Complaint and up until February 2023.[14] In its Initial Review Order, the Court permitted Plaintiff to proceed on his claim for damages against Broadley, Santavenere, Gallagher, Shea, and Cruz in their individual capacities for deliberate indifference to his medical needs in violation of the Eighth Amendment. IRO 7. Defendants say that Santavenere and Gallagher were not personally involved in treating Torres so could not be deliberately indifferent to his condition. Defs.' Mem. 16-18. As to Shea, Broadley, and Cruz, Defendants submit that Torres' chronic constipation and gallstones did not rise to a sufficiently serious condition. *Id.* at 18-21. Furthermore, Defendants maintain that Shea, Broadley, and Cruz were not deliberately indifferent to his condition. *Id.* at 21-28.

### 1.    Personal Involvement

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Where the asserted violation of constitutional rights involves medical care, a

---

[14] Defendants provided medical records up to June 2023. ECF No. 49. However, the records are incomplete after the colonoscopy and upper endoscopy performed in February 2023 as they do not include the results from those procedures and any notes from the specialist who reviewed those results.

defendant is liable only where the defendant "personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety." *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020).

Defendants assert that Santavenere and Gallagher were not subjectively aware of any risk to Torres' health. Defs.' Mem. 18. I agree. The record demonstrates that Santavenere, a nursing supervisor from 2020 until 2024, met on two occasions with Torres to explain the results of a CT scan and discuss other concerns that Torres had with the care he was receiving. ECF No. 53-8, ¶¶ 19, 25; ECF No. 49, at 581. Torres has not provided evidence that Santavenere was otherwise involved in or aware of decisions regarding his medical care. And Santavenere did not have authority to overrule any medical decisions by Torres' prescribers. *Id.* ¶¶ 8-11.

The same goes for Gallager. At all times relevant to this suit, Gallagher worked as an administrator responsible for reviewing HSARs. ECF No. 53-9, ¶¶ 4-13. Gallagher is not a medical professional and did not have authority to order changes to Torres' care plan. *Id.* ¶¶ 10-11.

Accordingly, I grant summary judgment in favor of defendants Gallagher and Santavenere.

### 2.    Objective Element

To establish the objective component of an Eighth Amendment violation, the alleged deprivation of medical care must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The Second Circuit has identified several non-exhaustive factors relevant to the inquiry into the seriousness of a medical condition: "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted).

If the incarcerated person's claim arises from an unreasonable delay in treatment or a challenge to the kind of treatment received, the seriousness inquiry focuses on the challenged delay or treatment "rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance,* 143 F.3d at 702). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Id.* (focusing on the particular risks attributable to the missed HIV medication, rather than on Smith's HIV positive status alone).

Defendants say that neither of Torres' treated conditions—severe constipation and gallstones—rose to the level of a serious medical condition. Defs.' Mem. 18-21. I disagree. The record reveals that Torres regularly reported being in acute abdominal pain. *See, e.g.*, ECF No. 49, at 255 (describing pain at a level 10, "Worst Pain Possible"); 652 (pain at a level 8, "Very Severe Pain"). On at least one occasion, Torres' condition was sufficiently severe that Cheshire's on-site providers recommended that Torres be evaluated by a specialist in the emergency department at Dempsey Hospital. ECF No. 49, at 309-310. And though Torres clearly received treatment from on-site and off-site providers, read in his favor, it is possible to find from this record that Torres' condition deteriorated while awaiting treatment. *See Smith*, 316 F.3d at 186. I thus conclude that a reasonable jury could find that Torres faced a

sufficiently severe risk of harm to satisfy the objective component of an Eighth Amendment deliberate indifference claim.

### 3.    Subjective Element

#### a.    Legal Standard

To satisfy the subjective component of the Eighth Amendment's deliberate indifference standard, a defendant must have been aware of a substantial risk that the incarcerated individual would suffer serious harm because of his or her actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Deliberate indifference is more than mere negligence—it is equivalent to "criminal recklessness," where an individual "disregards a risk of harm of which he is aware." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In general, medical malpractice does not suffice for deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Medical malpractice, may, however, rise to deliberate indifference if it "involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280.

"The state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). "Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise

must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Hudak v. Miller*, 28 F. Supp. 2d 827, 831 (S.D.N.Y. 1998) (Sotomayor, J.) ("[I]f the evidence shows that the risk of serious medical problems was so obvious that a reasonable factfinder could infer actual knowledge of them on [defendant's] part, this Court must deny summary judgment."); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *Bardo v. Wright*, No. 3:17-cv-1430 (JBA), 2019 WL 5864820, at *7 (D. Conn. Nov. 8, 2019).

It is well established that "[a] prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (citing *Estelle*, 429 U.S. at 106–07)). A medical provider may, however, act with deliberate indifference by consciously providing an individual with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentive. *Chance*, 143 F.3d at 703–04; *see also Braham v. Perelmuter*, No. 3:15-cv-1094 (JCH), 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017) (denying motion for summary judgment because a reasonable juror could infer "that the defendant-dentist had chosen an unsound—but easier—treatment route by extracting several of the plaintiff's teeth rather than trying to restore them, despite the possibility that extraction could result in the plaintiff's losing more teeth"). "Deliberate indifference may also be inferred where treatment was cursory or evidenced apathy." *Bardo*, 2019 WL 5864820, at *6 (internal quotation marks omitted); *Hannah v. Chouhan*, No. 3:04-cv-314 (JBA), 2005 WL 2042074, at *4 (D. Conn. Aug. 24, 2005); *see also Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994)

("A jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.").

### b.    Analysis

Defendants argue that no reasonable jury could find that Cruz, Broadley, and Shea were deliberately indifferent to Torres' medical needs. Defs.' Mem. 21-31. Torres responds that there is a dispute of material fact as to whether these defendants were deliberately indifferent to his suffering. Pl.'s Mem. 4-6. I address Broadley, Cruz, and Shea separately, concluding that each is entitled to summary judgment as to Torres' claim against them for damages for the time period from April 2017 to February 2023.[15]

### i.    Broadley

As an APRN at Cheshire, Broadley was responsible for evaluating Torres, prescribing medications, and deciding whether he should be referred to outside specialists. *See* ECF No. 53-6, ¶ 15.

Broadley determined in her medical judgment that Torres' abdominal pain was a symptom of his chronic constipation. ECF No. 53-6, ¶ 31. Broadley responded to Torres' reports of severe constipation by prescribing various laxatives and other medications, and encouraging Torres to attempt behavioral changes. ECF No. 53-6, ¶ 28-41. Broadley ordered blood tests and other diagnostics to rule out other potentially serious causes of constipation that could be treated only by surgery. *Id.* ¶¶ 24, 36. She notes that her plan in 2021 was for

---

[15] As I have concluded there is no dispute of material fact as to Torres' claim of deliberate medical indifference, I need not address Defendants' argument that they are entitled to qualified immunity. *See* Defs.' Mem. 43-46.

Torres to "undergo a CT scan to evaluate colon structure, and have Plaintiff seen by a Gastroenterologist to discuss further management of chronic constipation." *Id.* ¶ 42. After the CT scan revealed a gallstone, a blood blister on the liver, and a moderate amount of stool in the colon, Broadley wrote to Torres that "[n]either require any further intervention." ECF No. 49, at 599. After Torres was seen by a gastroenterologist, Broadley implemented the specialist's recommendation that Torres receive a colonoscopy, upper endoscopy, and a different laxative. ECF No. 53-6, ¶ 56.

Broadley responded in a similar manner after determining that Torres had gallstones. ECF No. 53-6, ¶ 48. When Torres reported intense pain in February 2022, prescribers at DOC transferred Torres to the emergency department at Dempsey Hospital to confirm that his pain was not caused by an obstructive gallstone that could be treated only with surgery. ECF No. 49, at 295; ECF No. 53-6, ¶ 48. Follow-up testing confirmed that Torres' gallstone was non-obstructive, ECF No. 53-6, ¶ 48, and an outside surgeon did not recommend surgery to address the gallstone, *id.* ¶ 57. Further imaging did not reveal "significant abnormalities, cause for concern, or cause for immediate medical intervention." *Id.* ¶ 55. Broadley implemented the surgeon's recommendation that "Plaintiff follow up with general surgery as needed if signs of gall bladder inflammation or blockage occur." *Id.* ¶ 57.

The record does not reveal evidence from which a jury could reasonably conclude that Broadley consciously disregarded a substantial risk of harm to Torres. *See Salahuddin*, 467 F.3d at 282. The record is similarly devoid of evidence of a risk so obvious that a jury could reasonably infer Broadley was aware of it and disregarded it. *Cf. Brock*, 315 F.3d at 164;

*Bardo*, 2019 WL 5864820, at *7.[16] Instead, the record shows that Broadley responded to Torres' reports of pain by ordering diagnostic testing, prescribing laxatives, modifying Torres' prescriptions in response to his reports of how his symptoms were progressing, and, when Torres' symptoms had still not abated, making referrals to outside specialists. ECF No. 53-6, ¶¶ 28, 35-37, 41-42. In addition, as noted, the record reflects that Broadley followed the recommendations of the gastroenterologist by changing Torres' medication and requesting that he receive a colonoscopy and upper endoscopy. ECF No. 49, at 211. Broadley concluded from an on-site radiography, her physical examinations of Torres, from a CT scan, and from the recommendations from an emergency room doctor, a gastroenterologist, and a surgeon that Torres' abdominal was not emergent or likely to become significantly more severe over time. ECF No. 53-6, ¶¶ 37, 41, 43. Broadley also had the benefit of assessments from Charles, another APRN at Cheshire. At no point does the record show that Broadley was aware that her actions or inaction posed a substantial risk to Torres.

Finally, no reasonable jury could find from this record that Broadley was indifferent to Torres' suffering or consciously chose "an easier and less efficacious treatment plan" for his symptoms. *Chance*, 143 F.3d at 703 (internal quotation marks omitted). Torres focuses in particular on the year-long delay in seeing an outside gastroenterologist at UConn Health, and in receiving the colonoscopy and upper endoscopy eventually ordered by the outside specialist. Pl.'s Mem. 6. But that does not suffice to create a triable issue of deliberate indifference. A jury could of course conclude that Broadley knew Torres was experiencing pain while waiting

---

[16] Such evidence of obvious risk is often provided by experts. *See, e.g.*, *Bardo,* 2019 WL 5864820, at *7. Neither party has included expert reports or testimony with its submissions.

to be seen by a specialist. *See, e.g.*, ECF No. 53-6, ¶ 31. But her unrebutted declaration and Torres' medical records do not suggest that Broadley believed a delay in seeing an outside specialist or in getting the procedures posed a serious risk of further exacerbating Torres' condition and that she took action or inaction in disregard of that risk. *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Indeed, Broadley has explained that she could not control the timing of Torres' appointments with specialists and outside procedures, and delays were exacerbated by the COVID-19 pandemic—which caused the suspension of many appointments for a period of time that in turn created a backlog. ECF No. 53-6, ¶¶ 8-10.[17] In addition, Broadley was not at Cheshire at all from September 2022 to June 2023. *Id.* ¶¶ 46-51. On August 30, 2022, Broadley saw Torres and followed up with DOC's Central Office to express Torres' concern that he had not had his colonoscopy and upper endoscopy. ECF No. 49, at 40. Soon after, she left Cheshire. The procedures were performed in February 2023 and Broadley returned to Cheshire in June 2023. ECF No. 53-6, ¶¶ 59-60.

In sum, Torres has failed to meet his burden of pointing to record evidence that would create an issue of material fact on this claim. *See Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015). Accordingly, based on the record of visits from February 2020 to February 2023, I find that no jury could reasonably conclude that Broadley acted with deliberate indifference towards Torres during this period.

---

[17] It appears that Broadley might have impacted the timing of Torres' outside appointments and procedures had she categorized the referrals as urgent or emergent. Shea Decl., ECF No. 53-10, ¶ 13. However, her apparent failure to do so does not demonstrate her deliberate indifference but rather reflects her medical judgment as to the urgency of Torres' conditions as compared to the conditions of other patients she was evaluating—a judgment that is unrebutted in this case. Moreover, the records reflect that Broadley multiple times confirmed referrals had been entered and at least once wrote to the DOC's Central Office regarding the timing of the colonoscopy and upper endoscopy. ECF No. 49, at 40.

### ii.    Cruz

As Head Nurse, Cruz evaluated Torres on several occasions. In evaluating Torres, Cruz reviewed his medical records, took his vital signs, and documented his reported symptoms. ECF No. 53-5, at 9-10, ¶¶ 70-77. Although Cruz deferred to the medical directives of Cheshire prescribers (including Broadley and Charles), Cruz did have the authority to ask that a prescriber reassess a patient. *Id.* at 2, ¶¶ 9-13.

Torres has not pointed to evidence that would support a reasonable finding that Cruz was subjectively aware that Torres faced a substantial risk of harm and disregarded that risk. Nor was Cruz positioned to override the medical judgment of Broadley: as head nurse, Cruz could ask only that Broadly reassess Torres, not order a new care plan. Finally, in the instances where Cruz directly evaluated Torres, there is no evidence that Cruz was subjectively aware of a serious risk to Torres and disregarded it. She subjectively believed, based on her observations and from her review of his medical records, that his condition was being treated appropriately by Broadley and other providers. *Id.* at 10, ¶ 78.

As a result, I conclude Cruz is entitled to summary judgment on Torres' claim of deliberate medical indifference.

### iii.    Shea

Shea was charged with overseeing DOC healthcare operations and supervising recordkeeping, among other duties. Shea Decl., ECF No. 53-10, ¶¶ 7-8. Shea is not and has not ever been a health care provider. *Id.* ¶ 11. Shea had authority to act on requests from DOC treatment providers that an incarcerated person be scheduled for an appointment with a specialist or a specialty procedure. *Id.* ¶ 13. Shea acknowledges that she can advocate for a change in the timing of a specialist appointment or procedure but does so only upon request of

a DOC clinical provider. *Id.* Shea relies on the DOC clinical providers to "advise on the emergent and urgent health care needs of the population." *Id.* Shea says that even when she advocates for a change in timing, she has no ability to guarantee that a patient will receive a specialist appointment or procedure on a date certain as DOC contracts with outside providers. *Id.* ¶ 14. Instead, the ultimate decision on any change in the timing of an appointment rests with the outside contracted provider. *Id.* ¶ 15. In general, Shea's involvement with Torres' care was limited to responding to his correspondence, reviewing his medical records, and forwarding his complaints to medical staff where relevant. At least once, she asked his providers to speak with him about test results and his care plan. *Id.* ¶ 24. Several times, she communicated with providers to ensure they knew of his concerns. *Id.* ¶¶ 27, 31. There is no evidence from the record that she disregarded a request from Torres' clinical providers, or indeed that she was aware of and disregarded a serious risk to his health.

Accordingly, Shea is also entitled to summary judgment on Torres' claim of deliberate medical indifference.

## B.    Retaliation

I turn next to Torres' claim that Cruz, Broadley, Cooper, and Shelton retaliated against him after he filed grievances against the medical staff.

Defendants assert that Torres failed to exhaust these retaliation claims as required by the Prison Litigation Reform Act. Defs.' Mem. 9-14. I need not decide whether an incarcerated person must file additional grievances to challenge the manner in which prison officials manage previously-filed grievances because I conclude that, on the merits, no jury could reasonably conclude that Broadley, Cruz, Cooper, or Shelton retaliated against Torres.

I understand Torres' retaliation claims to assert that, in response to Torres' numerous grievances, Defendants (1) rejected certain grievances on illegitimate procedural grounds and (2) provided subpar care.[18] First, Torres asserts that correctional staff rejected several of his grievances on procedural grounds as a form of retaliation. Compl. 13-15, ¶¶ 38, 47, 49, 52, 60. He identifies the following instances as being of particular concern: Shelton denied a Level 2 grievance that failed to include a record of the Level 1 disposition, Compl. 65, and notified Torres that if he sought to file a grievance regarding medical care he should do so pursuant to Administrative Directive 8.9, ECF No. 1-1, at 18. Similarly, Cooper rejected a grievance because she said that Torres had filed the grievance on the wrong form. ECF No. 1-1, at 42. Finally, Cruz rejected a grievance because she said that Torres was required to file his grievance on the recently-updated grievance form. ECF No. 1-1, at 24.

As to changes in his medical care, Torres focuses on the decision by his medical providers to modify the delivery of Trulance, a laxative he was prescribed in early 2021. Until June 2021, Torres was allowed to take Trulance in his cell. ECF No. 53-6, ¶ 44. But beginning in June 2021, Torres was required to take Trulance under the supervision of medical staff. *Id*. He says that his providers made this change in retaliation for his numerous grievances. Compl. 14, ¶ 47. Torres alleges that Broadley and Cruz thereby failed to "provide protection" in retaliation for his protected speech. Compl. 20-21, ¶ 106.

---

[18] The IRO assumed that Torres focused narrowly on inadequate medical treatment as retaliation for numerous grievances. IRO 10. Defendants understand Torres to be asserting both types of retaliation described above. Defs. Mem. 33 n.3. Torres' response brief addresses only whether there was a change in Torres' medical care as a result of his grievance. *See* Pl.'s Mem. 6-7. Nonetheless, in light of the clear allegation in the Complaint that Administrative Remedies Coordinators retaliated against Torres by rejecting his grievances, I address this argument.

To prevail on a First Amendment retaliation claim, a plaintiff must show "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).

Torres clearly satisfies the first retaliation requirement: courts in the Second Circuit have uniformly held that "[t]he filing of prison grievances is a protected activity." *Brandon*, 938 F.3d at 40. But the parties dispute whether Torres suffered an adverse action, and, if there was an adverse action, whether it was causally connected to Torres' protected activity.

The Second Circuit has cautioned courts "to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Id.*

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 353). The test for an adverse action is objective: even where the plaintiff was not subjectively deterred from filing grievances, an incarcerated plaintiff satisfies the adverse action requirement by pointing to action that would deter a reasonable inmate from continuing to assert their rights. *Brandon*, 938 F.3d at 40; *see also Dawes v. Walker*, 239 F.3d 489 (2d Cir. 2001) (defining an adverse action as "retaliatory

conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights") (internal quotation marks omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). In assessing whether an adverse action has occurred, the Second Circuit has cautioned that "prisoners may be required to tolerate more . . . than average citizens, before a retaliatory action taken against them is considered adverse." *Davis*, 320 F.3d at 353. For example, "[i]nsulting or disrespectful comments directed at an inmate generally do not rise to this level." *Id.* at 353. Several courts in this Circuit have concluded that mishandling a prison grievance is not an adverse action. *See Rizzuto v. Melecio*, No. 9:23-CV-1158 (LEK/ATB), 2023 WL 12107653, at *8 (N.D.N.Y. Dec. 4, 2023); *Smith v. Wildermuth*, No. 11-CV-241, 2013 WL 877399, at *12 (N.D.N.Y. Jan. 24, 2013) ("Merely ignoring letter[s] and grievances seems unlikely to deter a person from exercising his or her constitutional rights."), *report and recommendation adopted by* 2013 WL 877512 (N.D.N.Y. Mar. 11, 2013). "Once an adverse action is adequately shown, a plaintiff must still introduce evidence 'sufficient to support the inference that the speech played a substantial part in the adverse action.'" *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 354).

I conclude as a matter of law that the manner in which Defendants responded to Torres' grievances does not constitute an adverse action. In each instance where they rejected a grievance, Defendants provided cogent explanations of why Torres' grievance was procedurally defective and explained how Torres could submit a proper grievance, often including a copy of the relevant form as an attachment to their correspondence. *See, e.g.*, ECF No. 1-1, at 24, 42. Far from deterring future grievances, Defendants' actions provided a roadmap for how Torres could submit a compliant grievance that would be reviewed on the

merits. I do not doubt that Torres felt frustrated and perhaps confused by the complex procedure an incarcerated individual must follow to submit a procedurally compliant grievance. But that frustration, without more, does not constitute the kind of adverse action against an incarcerated individual that is prohibited by the First Amendment. *See Davis*, 320 F.3d at 353. I thus conclude Defendants are entitled to summary judgment on the claim regarding handling of grievances because no reasonable jury could conclude from this record that a similarly situated incarcerated individual would be deterred from filing further grievances.

Nor has Torres shown there to be a triable issue regarding his assertion that his providers offered subpar care in retaliation for his multiple grievances. Although Torres initially complained that his providers were depriving him of Trulance, one of the laxatives he was prescribed in 2021, the record reveals that, beginning in June 2021, Broadley merely required that Torres take the medication under the supervision of a clinician in response to Torres' reports that he remained constipated. ECF No. 53-6, ¶¶ 44-45. The unrebutted declaration from Broadley further establishes that she frequently required patients to take medication under observation in response to concerns that a medication was not producing the expected results. *Id.* ¶ 45. Thus, the record shows that Broadley modified the delivery of Torres' prescribed medication without interrupting his access to treatment. So even though it is clear that Torres would have preferred to take Trulance from the privacy of his cell, I cannot conclude that such a routine, incidental change in prescription management would deter a similarly situated incarcerated person from vindicating their right to file a grievance. As Torres has pointed to no other evidence in the record to support his assertion of retaliation, I conclude

that any change in Torres' care following his filing of grievances was not an adverse action in violation of the First Amendment.

Accordingly, I conclude that Defendants are entitled to summary judgment on Torres' claims of retaliation.

### C.    Injunctive Relief

The Initial Review Order permitted Torres to proceed on his request for injunctive relief to remedy an ongoing violation of his right to adequate medical care by Broadley, Santavenere, Gallagher, Shea, and Cruz. IRO 11. Torres' counsel confirmed at oral argument that Torres is continuing to pursue his request for an injunction directing DOC to provide him with access to a specialist to assess his continuing symptoms of abdominal pain.

Prospective injunctive relief against state employees in their official capacities is available under the doctrine of *Ex parte Young*, 209 U.S. 123, 159-160 (1908). I construe Torres to be seeking a permanent rather than a preliminary injunction. As with a preliminary injunction, a plaintiff is entitled to a permanent injunction only where he can show he will be irreparably harmed in the absence of an injunction. *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). Furthermore, a plaintiff is eligible for a permanent injunction if he actually succeeds on the merits of his claim. *Amoco Prod. Co. v. Vill. Of Gambell*, 480 U.S. 531, 546 n.12 (1987). To demonstrate irreparable harm, a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 153 (2d Cir. 1999) (citation and internal quotation marks omitted). Injunctive relief is further constrained by the Prison Litigation Reform Act, which provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary

to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a).

The Second Circuit has recognized that a plaintiff seeking injunctive relief satisfies the burden of demonstrating irreparable harm by establishing an actual and imminent violation of a constitutional right. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (stating that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"). Defendants move for summary judgment on the grounds that Torres has not suffered any Eighth Amendment violation. Defs.' Mem. 39-40. For the reasons stated above, I agree that Defendants were not deliberately indifferent to Torres' complaints of stomach pain between 2020 and February 2023, when he received a colonoscopy and upper endoscopy.

But as I observed at oral argument, the record of Torres' care from February 2023 onwards is sparse. This paucity of detail is not explained by an improvement in Torres' condition: at his deposition on July 24, 2024, Torres stated "I be having stomach problems all the time, and it's—it's constantly." ECF No. 58-1, at 5. This failure to develop the record is particularly concerning in light of the discovery through the upper endoscopy two and a half years ago that Torres suffered from erosive reactive gastropathy and hiatal hernia. ECF No. 49, at 16.

Although Defendants do not describe erosive reactive gastropathy or its causes and symptoms, one published source defines the condition as an injury to the stomach lining "caused by chronic exposure to irritating substances." Cleveland Clinic, *Gastropathy: Types, Symptoms, Causes & Treatment*, https://my.clevelandclinic.org/health/diseases/24671-gastropathy (last updated Feb. 2, 2023). One cause of reactive gastropathy is chronic use of NSAIDs, i.e., anti-inflammatory medications such as ibuprofen. *Id.* Erosive reactive

gastropathy can cause abdominal pain. In addition, a hiatal hernia, which "occurs when the top of your stomach pushes up through an opening in your diaphragm into your chest" can cause gastroesophageal reflux disease, or GERD, which can include systems of heartburn and indigestion, among other symptoms. *See* Cleveland Clinic, Hiatal Hernia: What It Is, Symptoms, Treatment & Surgery, https://my.clevelandclinic.org/health/diseases/8098-hiatal-hernia (last updated June 30, 2023).

In her declaration, Broadley says she had reviewed Torres' medical records "up to present." *Id.* ¶ 16. However, the only information she provides about the period from February 2023 to present is that Torres' February 2023 colonoscopy and upper endoscopy did not reveal "any significant abnormalities, cause for concern, or cause for immediate medical intervention," ECF No. 53-6, ¶ 63, and the same was true of the two other upper endoscopies performed in November 2023 and November 2024. But Broadley's declaration nowhere mentions Torres' diagnosis with erosive reactive gastropathy and hiatal hernia. Instead, Broadley says that Torres was diagnosed with cholelithiasis and chronic constipation and that she provided appropriate treatment for these conditions. *Id.* ¶¶ 17, 27-31. Broadley's declaration also fails to explain why, if the February 2023 upper endoscopy did not reveal a cause for concern, Torres had another upper endoscopy nine months later and a third upper endoscopy another 12 months later.

The medical records attached to Defendants' motion for summary judgment do not include the reports from any of the three endoscopies[19] and indeed contain no records at all

---

[19] Dr. Williams' own description of the results of the first upper endoscopy is included at ECF No. 49, at 15-16.

after June 12, 2023—more than two years ago. At oral argument, Defense counsel explained that he provided only those medical records he understood to be directly relevant to Torres' claim of chronic constipation and ongoing pain in the lower abdomen.[20] Torres' counsel, although entitled to secure Torres' records from DOC[21] and specialists Torres saw in the community, acknowledged he had not requested or reviewed any records beyond those attached to Defendants' summary judgment motion.

This sparse record does not provide a solid foundation for resolving whether Torres is subject to an actual and imminent violation of his Eighth Amendment rights. Broadley asserts that none of the specialist procedures revealed cause for concern and maintains she was not subjectively aware that Torres faced a substantial risk of harm at any time. ECF No. 53-6, ¶ 64. Yet without counsel viewing and analyzing Torres' medical records from the past two years, and with no ability to consider these records myself, I cannot determine whether Torres' providers had information during this time period that Torres faced a substantial risk of harm and nonetheless declined to take action—and whether Torres presently faces an actual and imminent constitutional violation. *See Salahuddin*, 467 F.3d at 280. Broadley's conclusory statements about Torres' condition after February 2023 do not provide a basis for granting

---

[20] Defense counsel at oral argument appeared to draw a distinction between lower and upper abdominal pain. However, it is evident through the complaint and the medical records that Torres consistently complained of stomach pain and abdominal pain generally. Indeed, the gastroenterologist in March 2022 noted Torres' "postprandial epigastric pain" in recommending an upper endoscopy. "Epigastric" refers to the upper middle abdomen. *See* Cleveland Clinic, *Upper Abdominal Pain: Left, Right, Center, Causes & Treatments*, https://my.clevelandclinic.org/health/symptoms/24736-upper-abdominal-pain (last updated Feb. 15, 2023).

[21] DOC Administrative Directive 8.7, § 9.A provides that an incarcerated individual (or their attorney) may secure copies of the individual's DOC medical records.

summary judgment to Defendants on Torres' claim for injunctive relief—particularly given Broadley's failure to acknowledge two conditions, known to cause abdominal pain, that Torres was diagnosed with following the February 2023 upper endoscopy. *See* ECF No. 49, at 16-17 (Dr. Williams assessing Torres as having chronic constipation, erosive reactive gastropathy, and hiatal hernia). Thus, absent medical records from 2023 to present and briefing from counsel, I cannot say as a matter of law that Torres has not suffered deliberate indifference to his medical needs during this time period.

Fed. R. Civ. P. 56(e) describes the actions a court may take when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact." In such instances, a court may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e)(1)-(4). The Advisory Committee has counseled district courts that the "choice among possible orders should be designed to encourage proper presentation of the record." Fed. R. Civ. P. 56, advisory committee note of 2010. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."); *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) ("Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."); *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (recognizing that failing to verify uncontested

assertions in a movant's statement of facts "would derogate the truth-finding functions of the judicial process by substituting convenience for facts"); *CIT Bank, N.A. v. Howard*, No. 14-CV-7470 (SLT) (SMG), 2016 WL 6330406, at \*7-8 (E.D.N.Y. Oct. 27, 2016) (denying without prejudice motion for summary judgment where defects in motion could conceivably be cured by refiling).

As Defendants have not provided records of Torres' medical treatment from 2023 onwards and Torres' counsel has failed to secure these records through discovery or other means, I defer deciding whether Torres is entitled to injunctive relief on the claim that he is subject to ongoing deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants' motion for summary judgment on Torres' claim for injunctive relief is denied without prejudice.

## IV.    **CONCLUSION**

For the foregoing reasons, I conclude that Defendants are entitled to summary judgment on Torres' claim for damages relating to Eighth Amendment deliberate medical indifference and First Amendment retaliation. I find, however, that the record does not permit me to resolve whether Torres is entitled to injunctive relief, so I deny Defendants' motion for summary judgment on Torres' claim for injunctive relief without prejudice. On or before September 12, 2025, counsel shall file a joint notice proposing deadlines for briefing a renewed motion for summary judgment relating to Torres' entitlement to injunctive relief.

                                                    **SO ORDERED.**

New Haven, Connecticut
August 14, 2025

                                                    /s/*Sarah F. Russell*
                                                    SARAH F. RUSSELL
                                                    United States District Judge